# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 94-CA-00430-SCT

*EDWARD HARGETT, ROBERT D. COOK, CAPTAIN BRADFORD, STEVE PUCKETT, AND THE MISSISSIPPI DEPARTMENT OF CORRECTIONS*

*v.*

*JAMES D. LOGAN, BILLY CRUSE, CONNIE S. CALDWELL, TROY BLADES, LEWIS COLLINS, RICHARD SIMMONS, CHARLES LEONARD BUTCHER, DANNY DAVIS AND MARCUS MARTINEZ*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/94 |
| TRIAL JUDGE: | HON. HOWARD Q. DAVIS JR. |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  VAN GILLESPIE |
| ATTORNEY FOR APPELLEES: | JAMES D. LOGAN, PRO SE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 12/19/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/9/97 |

**BEFORE PRATHER, P.J., BANKS AND McRAE, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This appeal arises from an April 1, 1994 order of the Circuit Court of Sunflower County affirming the Sunflower County Magistrate's requiring the Mississippi Department of Corrections (MDOC) to establish a procedure to provide educational opportunity to protective custody inmates, including Appellees James Logan, et al. Appellants Edward Hargett, et al. contend that protective custody inmates within the MDOC do not have a constitutional right to be provided with the same educational opportunities as those provided the general prison population. Finding that the MDOC has a rational basis for giving protective custody inmates slightly different education opportunities from the general prison population, we reverse the trial court's decision.

I.

¶2. On November 24, 1992, the appellees, being incarcerated at Parchman and held in Unit 32 in protective custody, a form of administrative segregation from the general prison population, filed a Motion to Show Cause and/or Motion for Mandatory Injunction against the appellants. In the

motion, the appellees claimed that the MDOC denied "protective custody" inmates the same privileges as those afforded inmates in the general prison population, including *inter alia*, the constitutional right to rehabilitative educational programs while incarcerated.

¶3. At the February 24, 1993 hearing conducted by the magistrate, three of the appellees testified in reference to their claims concerning the educational programs. The appellees basically testified that they were not given the same basic educational, vocational, and college programs as members of the general prison population. Although the pleadings indicate that one of the appellees, Marcus Martinez, is on protective custody status, he stated in the hearing that, "Right now I'm at "C" Building--you know, I'm not on P.C. yet, you know, because--I been requesting to get on P.C. and have them putting me back on P.C." Nonetheless, Martinez claimed that where he is now situated, he cannot receive the same educational opportunities that he previously had.

¶**4.** Later in the February 24, 1993 hearing, Roger Cook, associate superintendent of Unit 32, asserted that one inmate housed there was approved to take a correspondence course through the superintendent's office. Cook testified that the correspondence courses are necessary for these inmates because the facility is not equipped to accommodate regular adult basic education, vocational education or college education programs. Because the protective custody inmates would have to mix with general population units, the security mission of protecting those inmates would be compromised; thus, Cook testified, protective custody inmates are allowed to take correspondence courses.

¶5. In response to questions from James Logan, a *pro se* plaintiff, Cook also stated that one inmate was allowed to take a correspondence course with restrictions. Because the course had instruments associated with it, the Parchman facility could not allow the instruments to be used. Cook asserted that the company offering the correspondence course assured him that the inmate could take the course without the instruments. Finally, Cook testified that inmates could take a correspondence course whether they were in protective custody or in close confinement.

¶6. The magistrate lastly heard from Christopher Epps, Director of Offender Services for MDOC, who also testified that the inmates in protective custody could receive correspondence and that he had previously approved correspondence sent from Oral Roberts and other sources. He noted that the inmates who received correspondence courses were very appreciative of them and were trying to obtain other certification, like a GED. Epps testified that the protective custody inmates do not attend adult basic education courses because of security reasons and limited resources. Epps' testimony reflected his skepticism about conducting the same educational programs for protective custody inmates as for general population inmates, based on the functional design of Unit 32, the logistics of handling personnel and materials, and security needs.

¶7. The magistrate eventually dismissed all but two of the appellees' claims. She granted the request of telephone privileges commensurate with those of the general population, to which the MDOC did not object. The magistrate reviewed the evidence gathered at the hearing to evaluate the restrictions placed upon inmates in protective custody, as compared to those in general population. In her March 4, 1994 Order, the magistrate recognized that the MDOC had significant concerns about the safety of protective custody inmates which necessitated regulations which may have been more restrictive. However, the magistrate also noted:

The undersigned is concerned however, that the educational opportunities for these inmates is unduly restrictive. MDOC has an obligation to provide rehabilitative services, including education to these inmates. MDOC must establish a method to insure that these inmates are provided with access to educational facilities.

Thus, the magistrate ordered that the MDOC establish a procedure to provide educational opportunity to protective custody inmates; at the same time, she dismissed the remaining allegations of the appellees.

¶8. After reviewing the record and the applicable law, the circuit court judge, on April 4, 1994, found that the recommendations of the magistrate were reasonable and approved and adopted her order. The circuit court judge was careful to note that the magistrate did not mandate that already existing educational slots be given to protective custody inmates; rather, he noted that, "She recommends only that M.D.O.C. adopt a policy to see that P.C. inmates are given the same opportunity for educational opportunities that they would have were they in general population."

¶9. According to prison officials, this administrative segregation is implemented for various reasons, the main reason in this instance being for these inmates' protection. Because of this concern for their safety, the appellees cannot participate in the exact same activities at the same time as the general population inmates. The appellees contended in their Motion to Show Cause and/or In the Alternative Motion for Mandatory Injunction, and in the subsequent hearing and pleadings, that protective custody inmates should receive the same privileges (such as education, visitation, etc.) as general population inmates.

## II.

¶10. The record establishes that MDOC and other officials at Parchman have taken steps to restrict participation by protective custody inmates in educational activities with general population prisoners at the facility. The appellants, the MDOC and some of its officials, have appealed the portion of the circuit court's ruling that required the MDOC to establish a procedure to provide educational opportunities to protective custody inmates, presenting the following issue to this Court:

> **WHETHER PROTECTIVE CUSTODY INMATES WITHIN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS HAVE A CONSTITUTIONAL RIGHT TO BE PROVIDED WITH THE SAME EDUCATIONAL OPPORTUNITIES AS THOSE PROVIDED THE GENERAL PRISON POPULATION.**

¶11. The MDOC and its officials contend that the Constitution does not grant to inmates held in protective custody the right to the same educational opportunities as those inmates who are a part of the general prison population. The appellees who are in protective custody argue that they are entitled to the exact same educational facilities as those inmates who are in the general prison population.

¶12. It is well settled that persons who are incarcerated are not necessarily precluded from constitutional safeguards simply because of their status as inmates. *McFadden v. State,* 542 So.2d 871, 875 (Miss. 1989). However, prison conditions may be restrictive and even harsh without violating an inmate's constitutional rights, as long as they treat similarly situated inmates similarly and

have a rational, if occasionally implausible, reason related to prison administration. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

¶13. A state has no constitutional obligation to provide basic educational or vocational training to prisoners. *Beck v. Lynaugh,* 842 F.2d 759, 762 (5th Cir. 1988)*; Newman v. Alabama*, 559 F.2d 283, 292 (5th Cir. 1977), *rev'd in part on other grounds sub nom., Alabama v. Pugh,* 483 U.S. 781 (1978). Failure to provide inmates with educational programs does not amount to constitutional deprivation. *Burnette v. Phelps,* 621 F.Supp. 1157, 1159 (M.D. La. 1985).

*¶14.* However, if prison authorities operate such educational programs, "each prisoner shall have impartially equal access on an objective standard of basic utility to the individual." *Newman,* 559 F.2d at 292. Therefore, when the state chooses to grant privileges to inmates in correctional facilities, it must treat those inmates fairly and equally; however, if the state chooses to treat inmates differently, then that treatment must bear a rational relation to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

*¶15.* Inmates of correctional facilities are entitled to adequate protection while incarcerated. *Sampson v. King,* 693 F.2d 566, 569 (5th Cir. 1982). As a result, security is a central concern of prison officials, who are best suited to determine practices and procedures necessary to maintain security and whose decisions will normally be upheld absent arbitrary and capricious actions. *Tubwell v. Griffith*, 742 F.2d 250, 252 (5th Cir. 1984). *See also Smith v. Bingham*, 914 F.2d 740, 742 (5th Cir. 1990). Administrative segregation is a standard procedure employed by correctional facilities around the country to eliminate threats to prisoners and prison security. The Fifth Circuit has recognized as legitimate those efforts by correctional facilities to accommodate protective custody or administrative segregation inmates with amenities and privileges as close as reasonably possible to those of general population inmates. *See, e.g., Dorrough v. Hogan,* 563 F.2d 1259, 1262-1263 (5th Cir. 1977)(prisoners allowed to have correspondence courses and visitors in protective custody facility, but not allowed to participate in programs outside of building for safety concerns). Of course, courts must give great latitude to the administrators of these facilities when implementing these policies, based on the available resources and legitimate penological concerns. *Newman*, 559 F.2d at 286; *Terrell v. State*, 573 So. 2d 730, 732 (Miss. 1990).

¶16. There is no constitutional basis for a demand by these protective custody inmates that they be given the same privilege as general population inmates. The decision to grant these educational privileges and others is best left to prison officials, but it is still subject to the requirement that different treatment must be rational. *Mikeska v. Collins*, 900 F.2d 833, 837 (5th Cir. 1990). Because the MDOC has chosen to grant the privilege of educational facilities to members of the general prison population, inmates who are under protective custody should also have the opportunity to further their educational opportunities. However, the state may impose restrictions on how this privilege is afforded if the restrictions are rationally related to a legitimate interest. In this instance, the state has a rational basis for furthering the safety of those inmates within protective custody and maintaining security standards. *Smith*, 914 F.2d at 742. The MDOC has a finite amount of resources and uses them to the best of their discretion to further these interests. Further, the state has imposed the least restrictive means of protecting these inmates by not allowing them to engage in activities with other members of the general prison population.

¶17. The record is unclear as to whether these protective custody inmates have been totally denied access to correspondence programs. Although the *pro se* plaintiff/appellee Logan noted in the record that the correspondence programs may not have been available to protective custody inmates in the past, the MDOC adduced testimony to show that the correspondence courses are available and that at least one protective custody inmate tried to take advantage of them. There is nothing in the record to show that the plaintiffs/appellees have been denied the opportunity to further their education through the correspondence program currently in place. Further, there are no allegations that the plaintiffs/appellees sought remedial benefits of other programs within their Motion to Show Cause.

III.

¶18. Prison officials are entitled to draw the line where affording inmates certain privileges is overcome by the need for security and practicality. In this instance, the MDOC has made a good faith effort to accommodate the educational opportunities for protective custody inmates. The restrictions that inmates held in protective custody must endure are reasonably necessary for the prison officials to make meaningful efforts to maintain security. Although the magistrate and circuit court's concern about the educational facilities of the protective custody inmates is well-founded, it is not necessary. The MDOC already has a policy in place which encourages educational, vocational and other rehabilitative programs. Under this policy, protective custody inmates are given the chance to take correspondence courses similar to those offered to general population inmates. Based on the record before this Court, this imposition upon the protective custody inmates does not amount to a deprivation of rights which requires judicial intrusion.

¶19. Protective custody inmates have no constitutional right to educational programs. Even though these inmates are treated differently from general population inmates, the MDOC has a rational basis for this treatment. Because the MDOC already provides protective custody inmates adequate educational opportunities, we reverse the circuit court's order which mandated that the MDOC establish a procedure to provide educational programs for protective custody inmates. This appeal is hereby returned to the circuit court for entry of judgment consistent with this opinion.

¶20. **REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**